J-S47021-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INT. OF: N.Q.K., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.Y., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 826 MDA 2020 |

Appeal from the Decree Entered May 8, 2020
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s): A-8958

| | | |
|---|---|---|
| IN THE INT. OF: R.R.J., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.Y., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 827 MDA 2020 |

Appeal from the Decree Entered May 8, 2020
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s): A-8959

BEFORE:   STABILE, J., NICHOLS, J., and STRASSBURGER, J.[*]

MEMORANDUM BY NICHOLS, J.:          **FILED: JANUARY 11, 2021**

K.Y. (Mother) appeals from the decrees granting the petitions of Luzerne

County Children and Youth Services (CYS) for the involuntary termination of

_____

[*] Retired Senior Judge assigned to the Superior Court.

her parental rights to her daughter, R.R.J., born in June 2016, and son, N.K.Q., born in July 2017, (collectively, Children). We affirm.[1]

Relevant to the present matter, CYS obtained emergency custody of Children on May 8, 2018, when police found R.R.J., who was less than two years old at the time, hanging out of the window of Mother's apartment, unsupervised. Mother was sleeping at the time of the incident, and the police had a difficult time waking Mother while they knocked on her door. Children were placed in foster care because of Mother's drug and alcohol abuse, mental health issues and parenting issues. Children's fathers were not available resources at the time of placement as N.K.Q.'s father was incarcerated and the whereabouts of R.R.J.'s father were unknown.[2] On July 16, 2018, the orphans' court adjudicated Children dependent.

On October 22, 2019, CYS filed petitions to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(8) and (b). The

_____

[1] By separate orders entered the same day, the orphans' court involuntarily terminated the parental rights G.Q.K., the natural father of N.Q.K., and C.J., the natural father of R.R.J. G.Q.K. attended the evidentiary hearings but did not participate in this appeal. At the time of the evidentiary hearings, C.J.'s counsel indicated that C.J. did not contest the termination of his parental rights and that he would sign a consent to termination of his parental rights. N.T. 1/22/20, at 4-5. Neither G.Q.K. nor C.J. have appealed, and they have not participated in this appeal. No other unknown fathers have appealed.

[2] At the time of Children's removal from Mother's care, Mother's mother (Maternal Grandmother) was caring for Children's three older siblings, and Maternal Grandmother did not identify herself as a resource for Children until after CYS filed the petitions to terminate Mother's parental rights to Children.

orphans' court appointed Maria Turetsky, Esq., (Attorney Turetsky)[3] to serve as guardian *ad litem* and legal counsel (GAL/Counsel) for Children.[4]

On January 9, 2020, the orphans' court conducted an evidentiary hearing on the petitions. At the hearing, the CYS presented the testimony of Scott Carey, CEO and Clinical Treatment Supervisor at Wyoming Valley Alcohol and Drug Services; Rebecca Ciliberto, a case manager in the Intensive Family Reunification Program at Family Service Association; Michelle Lutinski, a case manager at Family Service Association; Raina Cole, Director of Intake Services at Northeast Counseling Services; Anthony Black, an employee at Community Counseling Services; Kristie Rollman, a permanency plan worker for CYS; Christina Oprishko, a treatment coordinator for Luzerne County Division of

_____

[3] It appears from this Court's docket that Attorney Turetsky was formerly listed as Maria Margaret Bertha but has since changed her last name.

[4] In ***In re Adoption of L.B.M.***, 161 A.3d 172 (Pa. 2017) (plurality), our Supreme Court held that 23 Pa.C.S. § 2313(a) requires that counsel be appointed to represent the legal interest of any child involved in a contested involuntary termination proceeding. The Court defined a child's legal interest as synonymous with his or her preferred outcome.

At the time of the instant hearing, the Children were two and three years old. In ***In re T.S.***, 192 A.3d 1080 (Pa. 2018), our Supreme Court held that the trial court did not err in allowing the children's guardian *ad litem* to act as their sole representative during the termination proceeding because, at two and three years old, they were incapable of expressing their preferred outcome.

Corrections; and Serena Stackhouse, a drug and alcohol counselor at Graniteville House of Recovery. Mother testified on her own behalf.

On January 22, 2020, the orphans' court conducted a second evidentiary hearing on the petitions. CYS presented the testimony of Ms. Rollman. Mother presented the testimony of Maternal Grandmother, and Mother testified again on her own behalf.

On May 8, 2020, the orphans' court entered decrees involuntarily terminating Mother's parental rights to Children pursuant to 23 Pa.C.S. § 2511(a)(8) and (b). Mother timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[5]

The orphans' court filed an opinion pursuant to Rule 1925(a) explaining its findings and conclusions under Section 2511(a)(8) and (b). Specifically, as to Section 2511(a)(8), the orphans' court summarized the evidence from the hearings as follows:

> Mr. Scott Carey testified that he is employed at Wyoming Valley Alcohol and Drug Services, a local outpatient treatment provider for substance abuse disorder. Mr. Carey indicated that he is the assistant chief executive officer and clinical treatment supervisor. Mr. Carey stated that he had access to all of Mother's records at Wyoming Valley Alcohol and Drug services.
>
> According to Mr. Carey, Mother was referred to Wyoming Valley Alcohol and Drug Services on May 25, 2018 by [CYS]. Mr. Carey testified that Mother appeared for an intake at his office on May 25, 2018; however, only a portion of the intake assessment was taken from Mother. Mother was asked to return on June 1, 2018

---

[5] On July 29, 2020, this Court, acting *sua sponte*, consolidated the appeals.

to complete the intake; however, Mother did not appear for her appointment.

Mother was then rescheduled for her next intake appointment which was December 18, 2018. Mother did not appear for that appointment. Mr. Carey testified that other than her first intake appointment, Mother did not appear for any additional appointments in order to complete her evaluation.

Mr. Carey testified that prior to May 25, 2018, Mother did engage in a treatment program at Wyoming Valley Alcohol and Drug Services; however, Mother did not successfully complete any treatment program at Wyoming Valley Alcohol and Drug Services.

Ms. Rebecca Ciliberto testified that she is employed at Family Service Association as a case manager in the Intensive Family Reunification Service Program (IFRSP). Ms. Ciliberto testified that she received the referral from [CYS] on May 31, 2018. Ms. Ciliberto testified that she met Mother at the [CYS] office on June 8, 2018 in order to complete the paperwork for the program. Ms. Ciliberto then scheduled a meeting with Mother on June 12, 2018 at Mother's residence. When Ms. Ciliberto arrived at Mother's home, Mother was not present.

Ms. Ciliberto testified that Mother did not have a telephone; therefore, she was not able to contact her. Ms. Ciliberto was finally able to contact Mother on June 29, 2018 at [CYS]. Ms. Ciliberto testified that on that day, she observed a visit between Mother and [Children]. [However,] Ms. Ciliberto was not able to have a session with Mother [due to a family celebration]. Another session was scheduled at [CYS] on July 5, 2018. Ms. Ciliberto indicated that she observed a visit between Mother and [C]hildren at [CYS] on July 5, 2018 and then scheduled another parenting session with Mother. After meeting Mother on July 5, 2018, Ms. Ciliberto lost contact with Mother. Ms. Ciliberto indicated that the telephone number she had for Mother was not in service. Ms. Ciliberto was later informed that Mother was incarcerated.[6] Ms. Ciliberto indicated that since her agency was unable to work with incarcerated patients, Mother was deferred from the program. Ms. Ciliberto was not able to develop any goals for Mother in the

---

[6] It appears that Mother was incarcerated for an unspecified amount of time in 2018, and from September to December of 2019. However, neither party produced evidence or testimony specifying the dates or reasons for Mother's incarceration.

program. She was unable to schedule meetings with Mother and have interactive sessions with her.

Ms. Ciliberto testified that during [one of] her interactions with Mother, she suspected that Mother was under the influence of alcohol or a controlled substance while she was with [Children].

Mr. Paul Dorang testified that he is employed at Family Service Association as a case manager. Mr. Dorang indicated that he received a referral from [CYS] on December 13, 2018 regarding Mother in this case. According to Mr. Dorang, the referral was for the Intensive Family Reunification Program.

Mr. Dorang testified that he met with Mother sometime in January 2019 in order to explain the program, the policies and the procedures. Mr. Dorang testified that he created three goals for Mother in the program. The first goal was for Mother to obtain and maintain stable housing. The second goal was for Mother to understand how her personal decisions affect her as well as her kids. The last goal was for Mother to maintain her sobriety and complete all mental health services. Mr. Dorang testified that he had approximately ten (10) sessions with Mother working with her until May of 2019. Mr. Dorang also observed nine (9) visits between Mother and [C]hildren. Mr. Dorang testified that he did not have any concerns with Mother's basic parenting skills; however, he did have concerns Mother's interaction with [C]hildren during the visits.

According to Mr. Dorang, Mother had mental health issues. Mr. Dorang testified that Mother had mood swings and at times she would storm out of the visits or not appear for the visits. She would also begin screaming and would be very argumentative and emotional. At times, Mother had to be removed from the room because it was too traumatic for [C]hildren.

According to Mr. Dorang, Mother also had trouble with her personal decision-making skills. Mr. Dorang testified that the relationship between Mother and N.[Q.]K.'s [f]ather was toxic. There was tension between Mother and [N.Q.K.'s f]ather. Mr. Dorang explained that many times Mother and [N.Q.K.'s f]ather would be fighting and arguing with each other prior to the visit. Mother would appear at the visits very emotional, crying and then storming out of the visits. During the first three months, Mother's emotional actions took place in the presence of the children. As a result, Mr. Dorang recommended that the parents have their visits separately. Mr. Dorang stated that even though the visits were

separate, Mother would still appear tense during the visits. She would be texting on her phone during the visits. Mr. Dorang indicated that when Mother was closed out of the program on May 24, 2019, [for lack of progress] he still had concerns with Mother's ability to effectively parent [C]hildren.

According to Mr. Dorang, Mother did not achieve the goal of obtaining and maintaining adequate housing. Besides not obtaining adequate housing, Mother did not achieve the goal of understanding how her personal decisions affect [C]hildren with respect to drug and alcohol services. Mr. Dorang indicated that during the first three months working with Mother, Mother was verbally motivated and expressed a willingness to accept services. However, Mother never followed through [with] services. Mr. Dorang indicated that Mother did not submit to any toxicology screens when she was instructed to do so. Mr. Dorang indicated that Mother understood the consequences of not following through with court ordered services specifically submitting to toxicology screens. According to Mr. Dorang, although Mother had good intentions and understood what was explained to her. Mother did not follow through with the services and did not submit to toxicology screens.

Mr. Dorang testified that Mother had missed three (3) parent education appointments. He explained that Mother did not follow through with her sessions. He stated that he gave Mother more than three chances to follow through. According to Mr. Dorang, when there were sessions scheduled, Mother would not call him to advise if she could not attend but would simply not attend without excuse. On occasion, Mother would "storm out" and not follow through with her scheduled sessions. Mr. Dorang further stated that Mother, at times, would appear thirty (30) minutes late for sessions without calling and would be very emotional. [C]hildren would be waiting for her. The case aides would have to calm Mother down prior to her visits. According to Mr. Dorang, Mother, at times, was a "wreck" and would break down. Mother would then be told to submit to a toxicology screen; however, Mother would not go.

Mr. Dorang testified that Mother also did not achieve her third goal of maintaining sobriety and completing recommended mental health services. As a result, Mother was "closed out" of the Intensive Family Reunification Service Program on May 24, 2019. Mr. Dorang emphasized that Mother was "closed out" of the program due to Mother's lack of progress by not remedying any

of the initial reasons for placement, lack of contact, noncompliance with drug and alcohol services, noncompliance with mental health services, and relationship issues with [N.Q.K.'s f]ather.

Ms. Raina Cole testified that she is employed at Northeast Counseling Services, an [o]utpatient mental health facility, as a director of intake services. Ms. Cole's duties involve administration in the admissions department, obtaining assessments, and [e]nsuring patients complete services.

Ms. Cole indicated that she received a referral for Mother for mental health evaluation from Luzerne County Children and Youth on March 26, 2019. Ms. Cole stated that she reached out to Mother on March 27, 2019 and left a message with an unidentified person for Mother to return the call. Ms. Cole was not able to reach Mother in order to schedule an assessment.

Ms. Cole stated that on April 17, 2019, Mother called and scheduled an appointment for April 19, 2019; however, Mother did not appear for that appointment. Ms. Cole stated that her agency sent letters to Mother in April and May of 2019; however, Mother never responded to the letters.

Orphans' Ct. Op., 6/29/20, at 6-11.[7] Based on the foregoing, the orphans' court concluded that CYS established grounds for termination under Section 2511(a)(8).

As to Section 2511(b), the orphans' court stated:

[CYS] presented credible testimony regarding the needs, welfare and best interest of [C]hildren, in relation to their Mother. [Kristie Rollman, a permanency plan worker for CYS,] testified that [Children] were placed with the foster parents on May 8, 2018. Ms. Rollman testified [Children] live with the foster parents and their newborn son. According to Ms. Rollman, [Children] are assimilated into the [foster] family. Ms. Rollman described seeing pictures of [C]hildren in the home and further indicated that [C]hildren attend all family functions. Ms. Rollman stated that

_____

[7] The trial court noted that Mother had made progress after the filing of the petitions to terminate her parental rights.

[C]hildren referred to their foster parents as "mom and dad". According to Ms. Rollman, the foster parents wish to adopt [C]hildren. The foster parents are also aware that[,] should they be permitted to adopt [C]hildren, . . . [C]hildren would have the same rights that biological children would have. Ms. Rollman indicated that she did not have any concerns regarding the foster parents' wish to adopt [Children].

Ms. Rollman testified that she believes the foster parents meet [C]hildren's physical needs. According to Ms. Rollman, the foster parents provide them with food, shelter, and clothing. The foster parents also meet [C]hildren's developmental needs. Ms. Rollman stated that [C]hildren are developmentally on target and they have age-appropriate toys in their home. Ms. Rollman testified that [C]hildren are also up-to-date on all the medical needs. Furthermore, the foster parents meet [C]hildren's emotional needs. For instance, when [C]hildren are happy, the foster parents congratulate them on their accomplishments. When [C]hildren are sad, the foster parents comfort them.

Ms. Rollman further indicated that there is a parent[-]child bond between the foster parents and [C]hildren. The foster parents meet all [C]hildren's needs. According to Ms. Rollman, there has been limited contact between Mother and [C]hildren. Ms. Rollman indicated that the last time Mother had seen the children was in May 2019. Ms. Rollman testified that after the visit, [R.R.J.] was exhibiting certain behaviors, and [N.Q.K.] was not engaged with [Mother] during the visits. Ms. Rollman indicated that[,] in light of [C]hildren not seeing [Mother] since May 2019, there was no longer a continued relationship between Mother and [C]hildren.

Ms. Rollman testified that the foster parents were able to meet all of [C]hildren's needs and there is a parent/child bond relationship between them. Due to the lack of contact between Mother and [C]hildren, Mother was not able to fulfill all of [C]hildren's needs and will not be able to provide them with permanency[,] and . . . adoption would be in their best interest.

*Id.* at 16-18 (record citations omitted).

The orphans' court, in its conclusion, acknowledged that Mother had made progress toward sobriety after the filing of the petitions to terminate her parental rights, but stated:

> Mother was given ample time to address and remedy her problems, but has failed to successfully do so. The [c]ourt finds that she is not currently able to meet [C]hildren's needs by failing to remedy her mental health issue, drug and alcohol issue and complete her parenting education.
>
> Th[e c]ourt was emotionally moved during Mother's testimony at hearing when she described the new life that she has found in sobriety. The [c]ourt sincerely hopes that Mother continues her pursuit of a sober life and continues to thrive in the new reality that freedom from substance abuse offers.
>
> However, [C]hildren needed their mother in May of 2018 and one year later in May of 2019, she was sadly unable to remedy the conditions that gave rise to placement. At the time of initial filing in October of 2019 and at the time of hearing in January 2020, the [c]ourt cannot base a decision upon hopes and intentions, however thankful it is that Mother has claimed them.
>
> The foster parents have amply demonstrated that they meet the physical, developmental and emotional needs of the minor children. [C]hildren . . . have thrived under their care. Today, [C]hildren need and deserve a permanent home with loving capable parents.

*Id.* at 20.

Mother raises one issue on appeal:

1. Whether the [orphans' court] erred in terminating parental rights and/or abused its discretion in giving primary consideration pursuant to 23 Pa.C.S.[ §] 2511(b) to the developmental, physical, and emotional needs and welfare of [Children] because testimony presented at trial establishes a strong parent-child bond that [termination] would be detrimental to the physical, emotional, and general well-being of [Children?]

- 10 -

Mother's Brief at 3.

In matters involving involuntary termination of parental rights, our

standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [9 A.3d 1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

The termination of parental rights is governed by Section 2511 of the

Adoption Act, 23 Pa.C.S. §§ 2101-2938, and requires a bifurcated analysis of

the grounds for termination followed by the needs and welfare of the children.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We

have defined clear and convincing evidence as that which is so "clear, direct,

weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." **In re C.S.**, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (citation omitted).

Here, the orphans' court found that CYS established the grounds for termination under 23 Pa.C.S. § 2511(a)(8) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a)** **General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b).

Instantly, we initially note that Mother did not challenge the orphans' court's findings under Section 2511(a)(8) in her Pa.R.A.P. 1925(b) statement, nor has she addressed Section 2511(a)(8) in her brief. Accordingly, we find that Mother has waived any challenge to the orphans' court's findings and conclusions under Section 2511(a)(8).[8] *See In re M.Z.T.M.W.*, 163 A.3d 462, 465–66 (Pa. Super. 2017) (noting that "this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority"); *see also Krebs v. United Refining Company of Pennsylvania*, 893 A.2d 776, 797 (Pa. Super. 2006)

_____

[8] Even if not waived, however, we would deem any challenge to the termination under Section 2511(a)(8) to be meritless.

We have explained:

> Section [2511] (a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court. Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of [the child welfare agency] supplied over a realistic time period. Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of [the child welfare agency] services.

*In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (citations omitted).

Here, the orphans' court adequately addressed all of the elements of Section 2511(a)(8), and the record overwhelmingly supported the orphans' court's decision, findings, and conclusions. *See* Orphans' Ct. Op. at 5-18.

- 13 -

(stating that any issue not set forth in or suggested by an appellate brief's statement of questions involved is deemed waived).

Mother, in the single issue presented in this appeal, asserts that the orphans' court erred in finding termination of her parental rights justified under Section 2511(b). Mother argues that CYS failed to present clear and convincing evidence that termination of her parental rights would be in the best interest of the Children. Mother's Brief at 11. Specifically, Mother contends that CYS "failed to prove that it would not be detrimental to sever the parent-child bond between Appellant and [Children]." *Id.* at 13. According to Mother:

> Testimony from the caseworker states that there is a level of comfort between [Children and Mother] and that, at times, [C]hildren, during their supervised visitation, went to [Mother] seeking that comfort.
>
> This testimony is supported by [Maternal Grandmother]'s testimony, who has regularly observed visitation between [Mother and Children] before placement. She also testified that there is a very strong and very close relationship between [Children] and their siblings.
>
> It is clear that [Mother] shares a strong and loving bond with [Children] and that it would be detrimental to separate parent and children in this instance. When visits are occurring in an unnatural and somewhat staged setting, it may be difficult to ascertain the full perspective of how strong the mother-child bond is.
>
> However, testimony presented in this case established there was at least a strong bond prior to placement. [Mother] spent every day of her life with [Children]. She testified that when she is a sober parent, as she is now, she is an amazing parent and can do a good job. Again, the consideration the [orphans' c]ourt needs to allocate to the child's best interests is separate and apart from

- 14 -

the conduct of [Mother]. [Mother] has undoubtedly given her best to not only meet the developmental, emotional, and physical needs of [C]hildren prior to placement, but she is prepared to . . . meet those same needs should [C]hildren be returned to her care.

*Id.* at 13-15.

As our Supreme Court has stated:

[I]f the grounds for termination under subsection (a) are met, a court shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability. [T]his Court [has] held that the determination of the child's needs and welfare requires consideration of the emotional bonds between the parent and child. The utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond.

*T.S.M.*, 71 A.3d at 267 (citations omitted)(formatting altered).

In the context of Section of 2511(b), the orphans' court "must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). "[A] parent's basic constitutional right to the custody and rearing of. . . her child is converted, upon the failure to fulfill. . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

- 15 -

It is sufficient for the orphans' court to rely on the opinions of social workers and caseworkers when evaluating the impact that termination of parental rights will have on a child. ***Id.*** The orphans' court may equally emphasize the safety needs of the child and may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. ***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011). Ultimately, the concern is the needs and welfare of a child. ***Z.P.***, 994 A.2d at 1121.

Instantly, as Mother notes there was evidence of a bond between Mother and Children. ***See*** N.T., 1/22/20, at 19 (indicating that Ms. Rollman observed Children going to Mother for comfort during visits), 36 (indicating that Maternal Grandmother observed a bond between Mother and Children), 61 (indicating that Mother testified that Children became upset when she would leave visits). However, the orphans' court found little to no evidence that severing the bond would have any detrimental effect on Children. ***See*** N.T., 6/29/20, at 20.

The competent evidence in the record supports the orphans' court's determination that termination of Mother's parental rights would serve Children's best interests. Children have been in foster care since May 8, 2018. ***See*** N.T., 1/9/20, at 107. The orphans' court credited Ms. Rollman's testimony that Children have been assimilated into the foster parents' family and that "there is a parent[-]child bond, they meet all their needs, [and Children] refer to them as mom and dad." N.T., 1/22/20, at 8, 10. Notably,

Ms. Rollman testified that Mother last visited Children in May of 2019. *Id.* at 11. Ms. Rollman indicated that R.R.J. "was exhibiting some behaviors after" Mother's visits and that N.Q.K. was not "very engaged during" the visits. *Id.* at 11. Ms. Rollman testified that because Mother has not seen them since May of 2019, the "continued relationship" between Mother and Children was "not there" at the time of the hearing. *Id.* Ms. Rollman did not believe that Children would suffer any detrimental effects if Mother's parental rights were terminated. *Id.* at 15.

Furthermore, we note that GAL/Counsel also recommended that termination of Mother's parental rights would serve Children's best interests. GAL/Counsel's Report and Recommendation, 2/19/20, at 4. GAL/Counsel observed the Children interact with their foster parents and noted that the "Children have a very strong and loving bond with the current foster family and they have found stability, consistency, dependability, and comfort with them." *Id.*

Therefore, having reviewed the orphans' court opinion and the record, we find competent evidence of record supporting the orphans' court's decision. *T.S.M.*, 71 A.3d at 267. We conclude that the orphans' court appropriately considered Children's need for safety and stability and determined that the termination of Mother's parental rights best served Children's needs and welfare. As we do not discern an error of law or abuse of discretion in the

orphans' court rulings, we affirm the decrees involuntarily terminating Mother's parental rights. ***See id.***

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 01/11/2021